IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ZOOM IMAGING, L.P. | : | CIVIL ACTION |
| | : | |
| v. | : | No.   06-4401 |
| | : | |
| ST. LUKE'S HOSPITAL AND | : | |
| HEALTH NETWORK, et al. | : | |

### MEMORANDUM AND ORDER

**Juan R. Sánchez, J.**                                                                                          **June 22, 2007**

Plaintiff Zoom Imaging, L.P. seeks discovery of confidential documents produced for an organizational study of Defendant Progressive Physician Associates, Inc.'s radiological practice. Because I find the documents are relevant, are not privileged, and federal law does not limit discovery based on confidentiality agreements, I will enforce the subpoena.

**FACTS**

In the spring of 2004, Drs. Michael Rothman and Gregg Schubach, both radiologists practicing in the Lehigh Valley area of Pennsylvania, formed a professional corporation, Vanguard Specialists, P.C., later changed to Zoom Imaging, L.P.  St. Luke's Hospital and Health Network and Progressive were the only providers of radiology services in the Lehigh Valley area prior to Zoom's formation.  Initially, Rothman and Schubach confined their practice to reading radiological images. In early 2005, they began planning a multi-modality imaging center to alleviate the shortage of radiological services in the valley.  Both before and after the center opened, Zoom alleges

1

Defendants organized a boycott of Zoom among physicians in the Lehigh Valley to eliminate competition for radiological imaging services.

Prior to forming Vanguard Specialists, Rothman and Schubach were members of Progressive. In the Fall of 2000, while Rothman and Schubach were associated with Progressive, Progressive retained Dr. Amiram Elwork to survey the staff as part of an organizational study to help Progressive improve its radiology practice. The study was based on confidential interviews and double-blind anonymous surveys in which the participants were asked to comment on Progressive's practice. The final study consisted of conclusory statements including statements bearing on Progressive's competitiveness in the market for radiological services. Zoom now seeks discovery of Elwork's documents related to the study.

**DISCUSSION**

Under Federal Rule of Civil Procedure 26, evidence is discoverable if it is "relevant to the claim or defense of any party." Fed.R.Civ.P. 26(b)(1). Even if it may not be admissible at trial, the evidence is discoverable if it "appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* Here, Zoom wants documents underlying an organizational study discussing Progressive's market position and suggesting there is room for additional radiological services in the area. Because Zoom is arguing it was precluded from competing in the market for radiological services despite a need for such services, I find the documents underlying the report are reasonably calculated to lead to the discovery of admissible evidence.

Progressive argues Elwork should not be forced to respond to the subpoena because his records are protected by the so-called self-critical analysis privilege. The self-critical analysis privilege has been employed by some courts to protect certain information from discovery,

particularly in instances where a compelling public interest outweighs the needs of litigants and the judicial system for access to information relevant to the litigation. 6 Moore's Federal Practice ¶ 26.48 [2]; *Webb v. Westinghouse Elec. Corp.*, 81 F.R.D. 431 (E.D.Pa. 1978). The privilege was not historically recognized at common law and has not been recognized by the Third Circuit. *See Davis v. Kraft Foods North America*, No. 03-6060, 2006 WL 3486461, at *2 (E.D.Pa. Dec. 1, 2006). Congress has also refused to create a self-critical analysis privilege. *Id.* The question becomes whether the privilege *should* be recognized under federal common law.

Analysis of the law of privileges begins with Rule 501 of the Federal Rules of Evidence.[1] Rule 501 "authorizes federal courts to define new privileges by interpreting 'common law principles . . . in the light of reason and experience.'"[2] *Jaffee v. Redmond*, 518 U.S. 1, 8 (1996). In enacting Rule 501, Congress "manifested an affirmative intention not to freeze the law of privileges. Its purpose rather was to 'provide the courts with the flexibility to develop rules of privilege on a case-by-case basis . . . .'"[3] *Trammel v. United States*, 445 U.S. 40, 47 (1980) (quoting 120 CONG. REC. 40, 891 (1974) (statement of Rep. William Hungate)).

---

[1] "Under this rule, in federal question cases the federal common law of privileges applies." *Wm. T. Thompson Co. v. General Nutrition Corp.*, 671 F.2d 100, 103 (3d Cir. 1982).

[2] Whenever the words "reason" and "experience" appear in quotes, the Supreme Court language is referenced.

[3] Although I recognize Rule 501 empowers me to "modify the common law of privileges, [I am] circumspect about creating new privileges based on perceive public policy considerations." *In re Grand Jury*, 103 F.3d 1140, 1154 (3d Cir.1997). This hesitance reflects the reality that "[t]he legislature, not the judiciary, is institutionally better equipped to perform the balancing of competing policy issues required in deciding whether the recognition of a . . . privilege is in the best interests of society." *Id*.

Rule 26 limits Rule 501's flexibility by favoring full disclosure of facts during discovery. *Wei v. Bodner*, 127 F.R.D. 91, 95-96 (D.N.J. 1989). Consistent with this liberal discovery policy is the view that privileges are not favored. *Herbert v. Lando*, 441 U.S. 153 (1979); *In re Grand Jury*, 103 F.3d 1140, 1149 (3d Cir. 1997). Privileges "are not lightly created nor expansively construed, for they are in derogation of the search for truth." *United States v. Nixon*, 418 U.S. 683, 710 (1974).

The Supreme Court has been hesitant to expand common law privileges. *University of Pennsylvania v. Equal Employment Opportunity Commission*, 493 U.S. 182, 189 (1990). Privileges hinder the fundamental principle that "the public . . . has a right to every man's evidence." *Trammel*, 445 U.S. at 50 (quoting *United States v. Bryan*, 339 U.S. 323 (1950)). Privileges must be strictly construed and tolerated "only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Trammel*, 445 U.S. at 50 (quoting *Elkins v. United States*, 364 U.S. 206, 234 (1960) (Frankfurter, J, dissenting)).

The Supreme Court in *Jaffee* recognized a privilege protecting confidential communications between a psychotherapist and her patient. 518 U.S. at 9-10. The Court focused on the "reason and experience" language from Rule 501. *Id*. at 8. As explained by the Seventh Circuit, "[r]eason tells us that psychotherapists and patients share a unique relationship in which the ability to communicate freely without the fear of public disclosure is the key to successful treatment." *Jaffee v. Redmond*, 51, F.3d 1345, 1355-56 (7th Cir. 1996) (cited with approval in *Jaffee*, 518 U.S. at 6). "As to experience, the [Seventh Circuit] observed that all 50 States have adopted some form of the psychotherapist-patient privilege." *Jaffee*, 518 U.S. at 6.

Analyzing the "reason" for the privilege, the Supreme Court found "the psychotherapist-patient privilege is rooted in the imperative need for confidence and trust." *Id.* at 10. Weighing the public interests at stake, the Court found "[i]n contrast to the significant public and private interests supporting recognition of the privilege, the likely evidentiary benefit that would result from the denial of the privilege is modest."[4]  *Id.* at 11. The Court concluded a psychotherapist privilege "promotes sufficiently important interests to outweigh the need for probative evidence . . . ." *Id.* at 9-10 (quoting *Trammel*, 445 U.S. at 51).

Progressive argues Dr. Elwork's notes should be protected under the self-critical analysis privilege because, "[t]he sole purpose of Dr. Elwork's engagement was to elicit candid input and constructive criticism from Progressive's physicians and employees so that Progressive could improve its radiology practice and level of patient care." Def.'s Br. at 3. A qualified self-critical analysis privilege was first recognized in *Bredice v. Doctors Hospital, Inc.*, 50 F.R.D. 249 (D.D.C. 1970), aff'd, 479 F.2d 920 (D.C.Cir. 1973).[5]  In that malpractice action, the court concluded confidentiality was essential to the self-evaluative meetings held at hospitals in an effort to improve patient care and treatment. 50 F.R.D. 249, 250. Without confidentiality, according to the court, physicians would not openly criticize their colleagues for fear the information would later be used in malpractice actions. *Id.* The lack of full disclosure would, in turn, hinder the improvement of

---

[4] There, the Court found eye-witnesses were available to testify regarding the legally significant facts sought by the party seeking disclosure. 518 U.S. 7.

[5] In *Bredice*, the Court addressed the privilege even though it was unnecessary to do so on the facts then before the court. *See Wei v. Bodner*, 127 F.R.D. 91, 100 (D.N.J. 1989).

medical care. The court recognized the existence of a self-evaluative privilege and found "exceptional necessity" was required to overcome the privilege.[6] *Id.* at 251.

Since *Bredice*, courts have applied the self-critical analysis privilege to protect information from discovery where the public interest in compliance with the law outweighs the need for discovery. *See Hogan v. City of Easton*, 2006 WL 3702637, No. 04-759, *8 n.8 (E.D. Pa. Dec. 12, 2006) (noting the privilege has been applied primarily "where the compelling public interest that individuals and businesses comply with the law outweighs the needs of litigants and the judicial system for access to information relevant to the litigation."). Here, there is no concern disclosure of the documents will hinder the public interest in compliance with the law. Instead, the argument is that the public has an interest in "promoting candid and forthright self-evaluation." *Granger v. National R.R. Passenger Corp.*, 116 F.R.D. 507, 509 (E.D. Pa. 1987). Progressive suggests under *Bredice*, this interest is particularly strong in the medical field.

While I am sensitive to the public interest in ensuring superior medical care, I am not persuaded the need to protect an outside consultant's notes outweighs the parties' and this Court's interest in securing "every man's evidence." *Trammel*, 445 U.S. at 50 (quoting *Bryan*, 339 U.S. 323). First, the reports at issue were created absent any government mandate. "[W]here self-evaluation has been voluntarily undertaken, '[n]either that fairness rationale nor [an] effective enforcement rationale operates . . . . No unfairness exists for no third party required [the defendant] to make a critical self-evaluation, or indeed, any evaluation at all.'" *Hardy v. New York News, Inc.*,

---

[6] Other courts have criticized *Bredice's* requirement of exceptional necessity. *See Spencer Savings Bank v. Excell Mortgage Corp.*, 960 F.Supp. 835, 839 (D.N.J. 1997) (noting criticism of the requirement), *Wei*, 127 F.R.D. at 100 (finding the requirement goes too far); *but see, Mewborn v. Heckler*, 101 F.R.D. 691 (D.D.C. 1984) (reaffirming the viability of *Bredice* and the exceptional necessity requirement).

114 F.R.D. 633, 641 (S.D.N.Y. 1987) (quoting *Resnick v. American Dental Ass'n*, 95 F.R.D. 372, 375 (N.D.Ill. 1982)). Second, I am unpersuaded a refusal to protect an evaluation of Progressive's business structure will endanger medical care in this country. Hospitals and private medical practices should and do evaluate their organizational structures on a regular basis. Such evaluation is both in the public interest and in the private interest of hospitals and medical practices. Competition in the medical field ensures this kind of self-evaluation will continue to occur, and disclosure of an evaluator's notes will do little to discourage this practice.

Unlike *Bredice*, disclosure of Dr. Elwork's notes will not discourage physicians in other cases from discussing clinical practices with their colleagues out of fear of malpractice liability. Here, the primary focus of the study was to evaluate Progressive's organizational structure and business practices and not its clinical practices. Furthermore, Progressive has not argued these notes involve personal patient information and have not argued for the application of a physician-patient privilege.[7]

After the Court in *Jaffee* concluded "reason" suggested creation of the psychotherapist privilege, it next considered whether "experience" supported this policy. There, the Court noted all 50 States and the District of Columbia had enacted some form of the privilege. 518 U.S. at 12-13. "[T]he existence of a consensus among the States indicates that 'reason and experience' support recognition of the privilege." *Id*. at 13 (quoting F.R.E. 501). Here, although most states, including Pennsylvania, have adopted statutory protections for medical peer reviews of patient care,[8] only a

---

[7] Although it is unlikely a physician-patient privilege exists at federal common law, *see Wei*, 127 F.R.D. at 97, there is no need to address that question here.

[8] *See* 63 P.S. § 425.4 (2007). Here, federal privileges apply, and there is no federal common law medical peer review privilege. *See Weiss v. County of Chester*, 231 F.R.D. 202, 205 (E.D. Pa. 2005)

few states have adopted a limited form of the self-critical analysis privilege.[9] This does not suggest a consensus among the States in favor of the privilege.

The *Jaffee* court next considered that the psychotherapist privilege appeared among the nine specific privileges recommended by the Advisory Committee on Rules of Evidence in 1972. 518 U.S. at 14 & 8 n. 7; *accord* Proposed Rules of Evidence for the United States Courts and Magistrates, 56 F.R.D. 183, 230-61 (1973). In contrast, the Supreme Court rejected a state legislative privilege in *United States v. Gillock* in part because no such privilege was included in the Advisory Committee's draft of the proposed rules. 445 U.S. 360, 367-68 (1980). Following the *Jaffee* decision, the Third Circuit stated, "[a] federal court should give due consideration, and accord proper weight, to the judgment of the Advisory Committee . . . when it evaluates whether it is appropriate to create a new privilege pursuant to Rule 501." *In re Grand Jury*, 103 F.3d at 1151. In that case, the Third Circuit rejected the creation of a parent-child privilege based in part on its omission from the privileges proposed by the Advisory Committee. *Id.* Here, the omission of the self-critical analysis privilege is similarly persuasive.

In *In re Grand Jury*, the Third Circuit also looked to the federal and state courts to determine if experience suggests the creation of a parent-child privilege. There, eight Federal Courts of

---

(applying federal common law of privileges to federal civil rights action and finding no medical peer review privilege in federal common law).

[9] *See, e.g.*, Colo. Rev. Stat. Ann. § 13-25-126.5 (West 2005) (qualified privilege for environmental audit report), La. Rev. Stat. Ann. § 6:336 (West 2005) (privilege for self-evaluations by bank or other financial institution), Minn. Stat. Ann. §§ 114C.22, 114C.26 (West 2005) (privilege for environmental audit report and self-evaluation form), Miss. Code Ann. § 49-2-71 (2007) (qualified privilege for environmental self-evaluation report), Utah Code Ann. §§ 19-7-105, 19-7-106, 19-7-107 (2006) (qualified privilege for environmental audit report in administrative proceeding).

Appeals and the overwhelming majority of state courts had explicitly rejected a parent-child privilege. *Id.* at 1147. Although a number of federal court decisions have recognized some form of the self-critical analysis privilege, the decisions in this Court recognizing the privilege have done so primarily in cases involving accident investigations, affirmative action plans, and internal police investigations.[10] As discussed above, most of the federal cases that have recognized the privilege have done so in areas where the self-critical analysis is either compulsory or part of an effort to comply with legal or regulatory requirements.[11] Numerous other federal courts have refused to recognize the privilege.[12] In the state courts, the privilege has been largely rejected except where the state legislatures have enacted statutes protecting medical review committee materials.[13] As stated

---

[10] *See, e.g.*, *Hogan v. City of Easton*, 2006 WL 3702637 at *8 n.8. (denying discovery of internal investigation in police excessive force case under the subsequent remedial measures doctrine, but concluding the self-critical analysis privilege would apply), *Melhorn v. N.J. Transit Rail Operations*, Inc., No. 98-6687, 2001 WL 516108, at *1 (E.D. Pa. May 15, 2001) (recognizing the privilege in a locomotive accident case, but limiting it to subjective information and only to cases where public policy outweighs the needs of litigants and the judicial system for access to information), *Clark v. Pennsylvania Power & Light Co.*, No. 98-3017, 1999 WL 225888, at *1 (E.D. Pa. April 14, 1999) (applying the privilege to an affirmative action plan in an employment discrimination case); *Granger v. National R. Passenger Corp.*, 116 F.R.D. 507, 510 (E.D. Pa. 1987) (applying the privilege to the subjective portions of a railroad accident report).

[11] *See Hogan v. City of Easton*, at *8 n.8.

[12] *See, e.g. In re Kaiser Aluminum Chemical Co.*, 214 F.3d 586 (5th Cir. 2000), *cert. denied*, 532 U.S. 919 (2001) (declining to recognize the privilege), *Burden-Meeke v. Welch*, 319 F.3d 897 (7th Cir. 2003) (declining to recognize the privilege), *Union Pacific R. Co., v. Mower*, 219 F.3d 1069 (9th Cir. 2000) (declining to recognize the privilege), *Davis v. Kraft Foods North America*, 2006 WL 3486461 at *2 (finding the privilege unlikely to be recognized in the Third Circuit).

[13] *Compare Ex Parte Cryer v. Corbett*, 814 So.2d 239 (Ala. 2001) (finding "little justification for creating a new privilege" other than the statutory medical peer review privilege), *and Wells Dairy, Inc. V. American Industrial Refrigeration, Inc.*, 690 N.W.2d 38 (Iowa 2004) (finding no privilege except as protected by medical peer review statute), *with Cloud v. Superior Court*, 58 Cal. Rptr. 2d 365 (Cal. Ct. App. 1996) (finding no privilege), *Combined Communications Corp. v. Public Service*, 865 P.2d 893 (Colo. App. 1993) (finding no privilege), *and University of Kentucky v. Courier*

previously, there is no federal medical peer review statute. *See Weiss v. County of Chester*, 231 F.R.D. 202, 206-07 (E.D. Pa. 2005) (rejecting assertion of a federal medical peer review privilege). Because "reason" and "experience" weigh against the creation of a self-critical analysis privilege, I decline applying such a privilege in this case.

Finally, Progressive argues Elwork's documents are protected by confidentiality agreements Elwork entered into with Progressive and the individuals completing surveys. These agreements, however, do not preclude the production of Elwork's documents for the purpose of discovery.[14] *See Grumman Aerospace Corporation v. Titanium Metals Corp. Of Am.*, 91 F.R.D. 84, 87 (E.D.N.Y. 1981) (holding a confidentiality agreement with a consultant was not the basis for quashing a subpoena in an antitrust case); *see also United States v. Davis*, 702 F.2d 418, 422 (2d Cir. 1983) (granting discovery of material protected by a confidentiality agreement and recognizing a private confidentiality agreement does not protect material from discovery as a formal protective order would); *c.f. Federal Open Market Committee of the Federal Reserve System v. Merrill*, 443 U.S. 340, 361 (1979) ("As with most evidentiary and discovery privileges recognized by law, 'there is no absolute privilege for trade secrets and similar confidential information.'"). In this case, the public interest in enforcing the antitrust laws and the need for discovery outweigh Progressive's interest in confidentiality. I will therefore enforce the subpoena, and order Elwork to produce the requested documents for the limited purpose of this litigation.[15]

---

*Journal & Louisville Times Co.*, 830 S.W.2d 373 (Ky. 1990) (finding no privilege).

[14] The parties may also wish to enter a confidentiality agreement limiting the use of this material to the litigation at hand.

[15] Elwork argues the Pennsylvania Code and the Ethical Principles of Psychologists promulgated by the American Psychological Association preclude him from disclosing the requested documents.

Accordingly I enter the following:

---

While Elwork is not a party to this case, Elwork's obligation under the Code and Ethical Principles do not preclude disclosure because Elwork was not providing psychological services to Progressive. *See, e.g.* 49 Pa. Code § 41.1 (2007) (defining a client as "[a] person, system, organization, group or family for whom a psychologist provides psychological services.").

# ORDER

AND NOW this 22nd day of June, 2007, Plaintiff's request to enforce the subpoena of Dr. Amiram Elwork is hereby GRANTED. Dr. Elwork is directed to produce the documents requested by Plaintiff Zoom Imaging, L.P. The documents produced by Dr. Elwork in response to Plaintiff's subpoena shall be used solely for the purpose of this litigation.

                                                                       BY THE COURT:

                                                                      /s/ Juan R. Sánchez
                                                                      Juan R. Sánchez, J.